# Anderson Excavating & Wrecking Company, Appellant, v. Sanitary Improvement District No. 177, Appellee.

654 N.W.2d 376

Filed December 27, 2002.   No. S-01-1178.

James D. Sherrets, Theodore R. Boecker, Jr., and Scott D. Jochim, of Sherrets & Boecker, L.L.C., for appellant.

Patrick G. Vipond and Robert A. Mooney, of Lamson, Dugan & Murray, L.L.P., and Donald R. Overholt for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Anderson Excavating & Wrecking Company (Anderson) appeals from an order of the district court finding that Anderson had repudiated a contract it entered into with Sanitary Improvement District No. 177 (SID) and determining that Anderson was not entitled to damages. We affirm because the court was not clearly wrong when it found that Anderson had repudiated the contract.

## BACKGROUND

In 1992, the SID sought bids for a seawall construction and dredging project at Riverside Lakes, which consists of residential property and adjoining manmade lakes. The project involved erecting seawalls around three islands in a boating lake and dredging the lake to make it more uniform in depth. The plans for the project were designed by an engineering firm, Lamp, Rynearson & Associates, Inc. (Lamp). The plans called for the dredged material to be disposed of on the three islands.

After receiving bids, the SID split the project into two contracts and phases of work. Phase I of the project involved the construction of the seawalls and was awarded to Big River Construction. Anderson was awarded phase II of the project, which involved the dredging of the lake. Anderson was concerned before the contract was signed that the seawalls would not be able to hold the weight of the dredged material. Anderson entered into the contract, however, and obtained a performance bond and insurance. The "Special Conditions" portion of the contract documents between the SID and Anderson provided in part:

> The CONTRACTOR shall excavate the existing lake by means of hydraulic dredge and shall dispose of the excavated material on the islands in the lake. . . .

. . . .

The dredged material shall be distributed on the islands in a manner to provide a generally smooth mounded surface capable of providing a seed bed. Trees do not have to be removed and lower vegetation can be buried in the fill. . . . Placement of dredged materials shall be done in such a manner as to provide a safe ledge at the seawall. Excess material surcharging the seawall shall be promptly removed and all damage to the seawall repaired by dredging contractor.

The CONTRACTOR shall report to the ENGINEER the location and extent of all obstructions to dredging encountered, at which time a change order will be prepared for removal thereof if additional work is determined to be advisable. . . . Obstructions shall be considered materials exceeding five (5) inches in diameter.

The "Agreement" portion of the contract documents provided:

The CONTRACTOR for the Seawall Construction shall commence work on the seawall within thirty (30) days after Notice of Award and shall complete the seawall on one island within twenty (20) working days. All seawall construction shall be completed by April 30, 1993. The CONTRACTOR for the lake dredging shall commence operations immediately upon completion of the seawall on the first island and shall complete all dredging and seeding operations on or before May 28, 1993.

There were delays in the progress of Big River Construction's work. Thus, on April 16, 1993, Lamp issued a change order which modified the contract to read: "The CONTRACTOR for the lake dredging shall commence operation after September 7, 1993, and shall complete all dredging and seeding operations on or before May 1, 1994." The "Supplementary Conditions" portion of the contract documents provided that "[t]he Contract Times will commence to run on the day indicated in the Notice to Proceed. In no event will the Notice to Proceed be issued later than six months after the Bid opening."

The record shows that in the normal course of construction business, a "notice to proceed" is sent to a contractor to formally notify the contractor to commence work. Anderson was never sent

a "notice to proceed," nor was it sent a notice that the contract had been terminated. Anderson also provided evidence that a notice to proceed is different from a change order. The SID, however, presented evidence that the change order fulfilled the notice-to-proceed requirement in the contract because it set a date fixing the date on which work would begin under the contract.

A dispute arose between Anderson and the SID about Anderson's ability to place the dredged material on the islands. According to Steven Braithwaite, Anderson's project manager, the islands were rounded on top and any material placed there would run off into the lake. Because the contract would hold Anderson liable for excess material surcharging the seawalls and for damage to the seawalls, Braithwaite was concerned about exposing Anderson to liability. According to Otto Ludewig, an engineer at Lamp, his firm's opinion was that the islands needed a "little bit of work" to flatten them out and that the addition of silt fences would allow the dredged material to be placed on the islands.

Anderson presented evidence that residents of the lake had complained about the possibility of depositing the dredged material on the islands and that the SID was looking for other sites for the material. Braithwaite testified that unless the island issue was resolved, there was nothing Anderson could do.

On August 16, 1993, Braithwaite sent a letter to Joel Bard, an engineer from Lamp, stating that Anderson had been assured in a meeting which had occurred during the past winter that the islands would be "bowled out in the middle" before Anderson commenced phase II and that this work had not been done. Braithwaite wrote that "it is not the responsibility of the dredger to prepare the islands for dredging materials. It is only the responsibility of the dredger to place the materials on the islands." The letter indicated that Anderson considered the problem to be an obstruction to dredging under the contract.

On August 17, 1993, Bard responded that the problem was not an obstruction under the contract. He further wrote that he agreed that bowling out the islands was one way to prepare the islands for disposal of the dredged material but also wrote that "[w]hile we and the [SID] were agreeing that you and Big River could make some agreement as to how to prepare the islands for

your convenience, neither Big River [n]or the [SID] was obligated to perform such work."

A meeting was held on August 19, 1993, between Braithwaite, Bard, Ludewig, and a consultant of Anderson to discuss the problem. Three options were discussed at the meeting: (1) issuance of a change order to allow additional payment to Anderson, (2) termination of the contract without financial liability to either party, and (3) execution of the work by Anderson according to Anderson's interpretation of the contract.

On August 24, 1993, Braithwaite wrote to Bard, stating:

> To prepare the islands for placement of dredged materials will cost approximately $27,000.00. If the S.I.D. is prepared to issue a Change Order to that effect Anderson will begin as agreed. However, if the S.I.D. is unwilling to issue the Change Order, then there appears to be only two other alternatives.
>
> First, they could rebid the dredging portion of the contract, and include the areas left unaddressed such as the island preparation. In this case Anderson would be willing to relinquish all rights under this contract without any further expense to the S.I.D., provided that the performance and payment bonds are returned . . . .
>
> The second alternative is less attractive in that it requires all parties to prepare for litigation and rely upon the judicial system for determination. This process is both very expensive and time consuming. However, should this become necessary, Anderson is also prepared to exercise this alternative.

After receiving the letter, Bard recommended that the SID accept the proposal to terminate the contract "[i]n view of the above disagreements and your desire to review the amount of dredging and possible alternate disposal sites . . . ." The SID did not terminate the contract. Anderson presented evidence that Lamp and the SID behaved as if there were a contract still in place after the August 24, 1993, letter was received. Bard stated that after August 1994, "the actual status of Anderson's contract was sort of in a never-land." Anderson never commenced work on the dredging project, and neither Lamp nor the SID demanded that work be commenced.

On December 20, 1996, Anderson brought suit against the SID alleging that (1) the SID refused to go forward with the contract or to sign a proposed change order to the contract about the responsibility for the preparation of the islands, (2) the SID failed to generate a notice to proceed for Anderson to begin work, (3) the SID abandoned and breached the contract, and (4) Anderson incurred expenses in preparing to begin work on the contract, including costs incurred for insurance and performance bonds. Anderson's petition alleged two causes of action: a breach of contract cause of action seeking lost profits, and a cause of action, labeled "Detrimental Reliance," seeking expenses for preparation for work on the project. The SID denied the allegations and alleged that Anderson had breached and abandoned the contract.

The SID moved for summary judgment. The district court granted the motion and dismissed Anderson's petition, and Anderson appealed. The Nebraska Court of Appeals, in an unpublished opinion, determined that there were genuine issues of material fact preventing summary judgment on the issue of Anderson's reliance on the contract and reversed, and remanded for further proceedings. See *Anderson Excavating v. SID No. 177*, No. A-98-1022, 2000 WL 559015 (Neb. App. May 2, 2000) (not designated for permanent publication). On remand, the SID moved for partial summary judgment on the breach of contract cause of action, arguing that the Court of Appeals' decision determined that there were issues of fact only on the "detrimental reliance" cause of action. The district court granted the motion.

After a bench trial, the court determined that Anderson had repudiated the contract when it sent the August 24, 1993, letter demanding a change order or that the project be rebid and threatening litigation. The court determined that the unilateral repudiation of the contract precluded any equitable claims for recovery or for breach of contract. The court dismissed the petition. Anderson's motion for a new trial was overruled. Anderson appeals.

## ASSIGNMENTS OF ERROR

Anderson assigns, rephrased, that the district court erred by (1) failing to find that the SID was in breach of the contract by failing to issue a notice to proceed and by delaying Anderson's

performance of the contract; (2) failing to find that Anderson was entitled to equitable relief, including damages for expenses; and (3) finding that Anderson had repudiated or abandoned the contract.

## STANDARD OF REVIEW

A suit for damages arising from breach of a contract presents an action at law. In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000).

## ANALYSIS

### WHETHER ACTION IS AT LAW OR IN EQUITY

Anderson contends that the court wrongly determined that it had repudiated the contract and was not entitled to equitable relief. Anderson argues that this is an equity action because it seeks to recover damages for "detrimental reliance." We disagree and determine that Anderson's claim is for breach of contract and is an action at law.

A party's "reliance interest" is a measure of damages in a contract action. Restatement (Second) of Contracts § 349 at 124 (1981). Reliance damages are defined as an alternative measure of damages under which "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Id.* The Restatement does not treat "detrimental reliance" as a separate cause of action. Instead, it is a measure of damages for breach of contract.

Here, Anderson sought expenses for preparation of work on the project under the contract and contends that the SID breached the contract by failing to issue a notice to proceed. Thus, Anderson was seeking reliance damages for breach of contract which is an action at law. We note that the court tried the case as if it were an action in equity. Because Anderson's action was actually an action at law, however, we will not reverse the court's factual findings unless they are clearly wrong.

REPUDIATION

Anderson contends that it did not repudiate the contract. The question whether there has been repudiation or whether repudiation was justified is a question of fact. *Chadd v. Midwest Franchise Corp.*, 226 Neb. 502, 412 N.W.2d 453 (1987). We have held that a repudiation is (1) a statement by the obligor to the obligee indicating that he or she will commit a breach that would of itself give the obligee a claim for damages for total breach or (2) a voluntary affirmative act which renders the obligor either unable or apparently unable to perform without such a breach. *Hooker and Heft v. Estate of Weinberger*, 203 Neb. 674, 279 N.W.2d 849 (1979); Restatement, *supra*, § 250.

Where performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance. Restatement, *supra*, § 253(2). Also, where a party's repudiation contributes materially to the nonoccurrence of a condition of one of his or her duties, the nonoccurrence is excused. *Chadd v. Midwest Franchise Corp., supra*; Restatement, *supra*, § 255.

> In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform. Mere expression of doubt as to his willingness or ability to perform is not enough to constitute a repudiation . . . . However, language that under a fair reading "amounts to a statement of intention not to perform except on conditions which go beyond the contract" constitutes a repudiation.

Restatement, *supra*, § 250, comment *b*. at 273. Accord Neb. U.C.C. § 2-610, comment 2 (Reissue 2001).

Here, Anderson sent a letter stating that it was facing additional expenses to prepare the seawalls. The letter then stated Anderson would perform if a change order was entered to provide for additional payment of $27,000. The letter stated that if a change order could not be made, the two remaining options were to rebid the contract or have the dispute settled through legal action. A reasonable reading of the letter shows that Anderson would not perform the contract as originally agreed. Thus, it was

not clearly erroneous for the court to find that the letter was a repudiation of the contract.

Anderson argues that the court wrongly focused on only the August 24, 1993, letter and should have considered events that happened before and after the letter was sent. For example, Anderson contends that the SID continued to behave as if a contract existed after the letter was sent and that there was evidence that the parties were still attempting to find a solution to the problem.

A repudiation can be nullified by a retraction of the statement before the injured party materially changes his or her position in reliance on the repudiation or indicates to the other party that he or she considers the repudiation to be final. See, *Gilmore v. Duderstadt*, 125 N.M. 330, 961 P.2d 175 (N.M. App. 1998); Restatement (Second) of Contracts § 256(1) (1981). But, to be effective, a retraction must be clear and unequivocal and it may not impose new conditions not in accord with the original contract. *Gilmore v. Duderstadt, supra.* The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his or her repudiation or to retract his or her repudiation. See, *Cedar Point Apartments v. Cedar Point Inv. Corp.*, 693 F.2d 748 (8th Cir. 1982); Restatement, *supra*, § 257.

Anderson's arguments fail because Anderson never specifically retracted its repudiation. Further, any additional attempts by the SID to change the location for the placement of the dredged material did not change the fact that a repudiation occurred. When Anderson repudiated the contract, the SID was excused from performing the condition of issuing a notice to proceed and was excused from performing any of its contractual duties. Thus, the court was not clearly wrong when it determined that Anderson had repudiated the contract and could not recover reliance damages.

## CONCLUSION

We determine that Anderson's claim for damages for detrimental reliance on the contract is an action at law for breach of contract. We further determine that the district court was not clearly wrong when it determined that Anderson had repudiated

the contract and could not recover reliance damages. Accordingly, we affirm.

AFFIRMED.